UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  11/10/2015
```

-------------------------------------------------------------------X
:
SUZANNE MCCARTHY, et al.,                        :
:
                          Plaintiffs,            :          14-CV-6194 (JMF)
:
           -v-                                   :          OPINION AND ORDER
:
ESTATE OF LAWRENCE EDWARD MCCARTHY, et           :
al.,                                             :
:
                          Defendants.            :
:
-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

         Suzanne and Lawrence McCarthy were divorced in 2012.  As part of their divorce

settlement, Lawrence agreed to pay their two daughters' college tuition and other expenses and

agreed to maintain life insurance policies that would pay a total of $4 million to Suzanne and

their daughters upon his death.  Lawrence did not live up to that agreement.  Most significantly,

after his death in 2013, Suzanne and her daughters learned that Lawrence had only $50,000 of

life insurance payable to them.  Making matters worse, they learned that, in the two years before

his death, he gave almost $360,000 to a girlfriend, Kateryna Zakharenko, and that he had another

life insurance policy, with the Aetna Life Insurance Company ("Aetna") for $500,000, but may

have named Zakharenko as the beneficiary.  In this suit, Suzanne and her daughters, Devon and

Emma, seek a ruling that they are entitled to the proceeds of the Aetna policy, which have been

deposited with the Clerk of Court.  They, and Lawrence's Estate (the "Estate"), a Defendant and

Cross-Claimant, also contend that they are entitled to money from Zakharenko on the grounds

that the payments and transfers Lawrence made to and on her behalf qualify as constructively

fraudulent transfers.  The Court held a bench trial on September 30, 2015, and now issues this

Opinion and Order setting forth its findings of fact and conclusions of law.

**FINDINGS OF FACT**

The following findings of fact are based on the evidence admitted at trial, including

affidavits representing the direct testimony of Plaintiffs Suzanne McCarthy and Devon

McCarthy, which are uncontested.  (*See* Bench Trial Tr. ("Trial Tr.") 3-4; Order (Docket No. 90)

1; Pls.' Proposed Findings Fact & Conclusions Law (Docket No. 92)).  Suzanne and Lawrence

(the "Decedent") married in 1992.  (Direct Test. Aff. Suzanne McCarthy ("SM Aff.") ¶ 6).  The

couple had two children, Devon, who was born on February 11, 1994, and Plaintiff Emma

McCarthy, who was born on December 19, 1996.  (*Id.* ¶ 7).  On April 11, 2012, Suzanne and the

Decedent divorced in the state of Florida.  (*Id.* ¶ 8).  In connection with the divorce, Suzanne and

the Decedent entered into a Marital Settlement Agreement (the "MSA"), which was incorporated

into the Florida Court's Final Judgment of Dissolution.  (*Id.* ¶ 10; Pls.' Trial Ex. A ("MSA")).

The MSA required the Decedent to pay child support, college tuition (including room and board)

for Devon and Emma, and other college expenses.  (SM Aff. ¶ 13; MSA 6-7).  In addition, it set

spousal support payments to Suzanne at $1 per month in recognition of the fact that the Decedent

— who had been a stockbroker at Lehman Brothers until it went bankrupt in 2008 — was

unemployed at the time of the divorce.  (*See* MSA 6; Direct Test. Aff. Devon McCarthy ("DM

Aff.") ¶¶ 6-7).  In consideration of both that accommodation and waiver of any claim to

additional assets from the Decedent, the MSA required the Decedent to maintain life insurance

policies providing $4,000,000 in benefits, with Suzanne as a one-half beneficiary and their two

daughters as one-quarter beneficiaries each.  (SM Aff. ¶ 15; MSA 10).  More specifically, the

2

MSA required the Decedent to maintain three policies: a Liberty Mutual policy and two Mass Mutual policies.  (SM Aff. ¶ 16; MSA 10).

Before Suzanne McCarthy and the Decedent were divorced, he began dating other women, including Defendant Zakharenko.  (SM Aff. ¶ 32).  As Plaintiffs later learned, he also began paying various expenses on Zakharenko's behalf and giving her other sums of money. First, according to credit card statements, the Decedent provided Zakharenko with a credit card and paid for $209,453.82 in expenditures from February 2011 through March 2013.  (SM Aff. ¶¶ 33-35; DM Aff. ¶¶ 26-27; Pls.' Trial Exs. E, F).  Second, the Decedent made transfers to Zakharenko's bank account totaling $75,652.01 from January 2012 to July 2013.  (SM Aff. ¶¶ 41-44; DM Aff. ¶¶ 28-29; Exs. J, K, Q).  And third, the Decedent paid Zakharenko's rent for the years 2012 and 2013 — approximately $3,000 per month, or $72,000 overall.  (SM Aff. ¶ 48; DM Aff. ¶ 30; Pls.' Trial Ex. L).  In total, the Decedent made approximately $357,105.83 in transfers to, or payments on behalf of, Zakharenko between 2011 and 2013.  Zakharenko and the Decedent did not live together, and no consideration was given by Zakharenko in exchange for those transfers and payments.  (SM Aff. ¶¶ 47, 54).

Notably, during the time of these transfers to and payments on behalf of Zakharenko, the Decedent had significant outstanding liabilities.  First, the Decedent owed $93,196 to the State of New York pursuant to a consent to liability for tax years 2006-2009.  (DM Aff. ¶ 38; Pls.' Trial Ex. S).  With interest, that obligation grew to $163,108 by September 2014.  (*Id.*).  Second, at all relevant times, the Decedent was required by the MSA to maintain $4 million in life insurance policies for the benefit of Plaintiffs.  (MSA 10).  Third, beginning in 2012, the Decedent became unable to pay for Devon's college expenses, as required under the MSA.  (DM Aff. ¶ 36; MSA 6).  The Decedent borrowed $60,000 to cover those expenses, and Devon herself borrowed or

paid approximately $50,000 to pay the remainder.  (DM Aff. ¶ 36).  Fourth, in April 2013, the

Decedent was unable to pay an American Express bill for $93,228.67.  (Pls.' Trial Ex. H).  The

only significant arguable asset that the Decedent appears to have had during this time period was

a contingent claim for $4,500,083.35 against Lehman Brothers Holdings, Inc. in its bankruptcy

proceeding — $4,489,133.35 for compensation in the form of Restricted Stock Units (or

"RSUs") and $10,950 for stock options, both of which the Bankruptcy Court had reclassified as

highly subordinate "equity" interests.  (DM Aff. ¶¶ 40-42; Pls.' Trial Ex. T).

     The Decedent died in December 2013.  (SM Aff. ¶ 27).  After his death, Plaintiffs

attempted to collect the promised $4 million in life insurance.  Plaintiffs discovered that, contrary

to the terms of the MSA, the Liberty Mutual policy referenced in the MSA insured Suzanne

McCarthy's life, not the Decedent's.  (SM Aff. ¶ 20; Pls.' Trial Ex. B).  Plaintiffs also discovered

that one of the Mass Mutual policies, providing for $2.9 million in benefits, had been allowed to

lapse before the Decedent's death.  (SM Aff. ¶ 27; Pls.' Trial Ex. D).  Suzanne herself saved the

other Mass Mutual policy from lapsing and Plaintiffs later received a $50,214.83 payment under

that policy.  (SM Aff. ¶ 26).  Eventually, Plaintiffs learned that the Decedent had obtained a

$500,000 life insurance policy from Aetna through a new employer, Cantor Fitzgerald.  (SM Aff.

¶ 50).  Although Cantor Fitzgerald's records indicate that the Decedent designated Suzanne as

the beneficiary of that policy (SM Aff. ¶ 57; Pls.' Trial Ex. P), the Universal Enrollment Form

filed with Aetna designated Zakharenko as primary beneficiary.  (Pls.' Trial Ex. M).  Zakharenko

gave no consideration in connection with the Aetna policy; indeed, she admitted that she did not

even learn about the policy until months after the Decedent's death.  (SM Aff. ¶ 55; Pls.' Trial

Ex. O).

In light of the discrepancy between Cantor Fitzgerald's records and the Universal Enrollment Form, Aetna refused to pay Plaintiffs the proceeds of the Aetna policy.  Thus, Plaintiffs did not receive $3,949,785.17 of the $4,000,000 in death benefits promised to them in the MSA.  (SM Aff. ¶ 31).  In addition, the Decedent failed to make or provide for tuition and expense payments for Devon and Emma, as he was required to do under the terms of the MSA.  (DM Aff. ¶ 36).  The Decedent had to borrow $60,000 to cover part of Devon's spring 2013 and fall 2014 college expenses.  (*Id.*).  As of June 2015, Devon had to borrow or pay out of pocket $50,000 to cover additional college expenses.  (*Id.*).  Further, future college expenses for Devon and Emma are expected to be $100,000, all of which will have to be paid by Plaintiffs.  (*Id.*).  The Estate is insolvent and unable to pay the Decedent's debts, including his various obligations to Plaintiffs under the MSA.  (*See* Pls.' Trial Ex. R).

## PROCEDURAL HISTORY

Plaintiffs originally filed this case in New York state court, naming as Defendants the Estate, Aetna, and Zakharenko.  (Docket No. 1).  On August 5, 2014, Zakharenko, represented by Jules A. Epstein, Esq., removed the case to this Court on the ground that it presented a federal question under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*  (Docket No. 1).  On November 5, 2014, shortly after an initial pretrial conference was held, the Court so ordered a stipulation among the parties providing that Aetna would deposit $495,000 — the proceeds of the contested life insurance policy — with the Clerk of the Court and that all claims and cross-claims against Aetna would then be dismissed.  (Docket No.

24).[1]  After Aetna made that deposit, it was terminated as a party on December 1, 2014.  (Docket No. 35).

Thereafter, the parties engaged in discovery.  On March 19, 2015, approximately one month before discovery was scheduled to close, Zakharenko's counsel, Epstein, filed a motion pursuant to Rule 1.4 of the Court's Local Rules seeking to withdraw as counsel for Zakharenko on the ground that she had ceased communicating with him and that her "conduct and unwillingness to follow [his] advi[c]e [had made] it impossible [for him] to effectively represent her."  (Docket Nos. 52, 54).  The Court ordered that Epstein serve his motion to withdraw on Zakharenko and file proof of such service no later than March 25, 2015.  (Docket No. 55).  The Court also ordered that any opposition to the motion be filed by April 8, 2015.  (*Id.*).  Although Epstein served the motion to withdraw on Zakharenko on March 23, 2015 (Docket No. 57), she never filed any response with the Court.  Accordingly, by Order entered on April 17, 2015, the Court granted Epstein's motion to withdraw, but — to ensure that his withdrawal did not cause undue delay in the litigation (or prejudice Zakharenko) — ordered that his withdrawal would not take effect until the close of discovery.  (Docket No. 68).  The Court directed Zakharenko to "take immediate steps to either: (a) secure a lawyer admitted to practice in this Court to represent her; or (b) prepare to represent herself."  (*Id.*).  The Court's Order was served on Zakharenko on April 20, 2015.  (Docket No. 69).

On May 1, 2015, Zakharenko filed a letter asking the Court to discharge Epstein "on an urgent basis," stating that she was "able" to represent herself and requesting a "chance" to do so. (Docket No. 72).  Three days later, Zakharenko and Epstein attended a conference, and

---

[1]     The parties stipulated that $495,000, rather than the full $500,000 value of the policy, would be deposited in full satisfaction of all parties' claims against Aetna for reasons that do not appear to be in the record.  (Docket No. 24).

Zakharenko informed the Court that she intended to proceed *pro se*.  Accordingly, and as memorialized in an Order entered the following day, the Court relieved Epstein effective immediately.  (Docket No. 74).  In addition, the Court granted Zakharenko some additional time to complete discovery, and ordered Plaintiffs to submit (and serve on Zakharenko) their trial papers — including the direct testimony by affidavit of any witnesses they planned to call and exhibits — no later than June 18, 2015.  (*Id.*).  The Court ordered Zakharenko, "[w]ithin two weeks of the date on which" she was served with Plaintiffs' trial materials, to file "a written statement" containing, among other things, a list of the evidence that she planned to offer at trial, a list of the witnesses that she planned to call at trial (including herself), and the names of any of Plaintiffs' witnesses that she intended to cross-examine at trial.  (*Id.*).  By the same date, Zakharenko was also required to "file affidavits, sworn under penalty of perjury, containing the direct testimony of each trial witness she intend[ed] to call at trial (including herself)."  (*Id.*). The Court advised Zakharenko that each such affidavit "should be treated as a direct substitute for the witness's live testimony; that is, Ms. Zakharenko should be attentive to the Rules of Evidence (*e.g.*, hearsay and the like) and authenticate any exhibits that will be offered through that witness's testimony."  (*Id.*).  On May 6, 2015, Zakharenko entered a formal notice of appearance that she was representing herself.  (Docket No. 76).

Plaintiffs filed their trial materials on schedule (Docket No. 77), but serving Zakharenko proved to be more complicated.  As set forth in a letter dated June 23, 2015, Plaintiffs' counsel sent the trial materials to Zakharenko by Federal Express on June 16, 2015, but subsequently learned that they were not delivered.  (Docket No. 78).  As detailed in that letter and another letter dated August 18, 2015, Plaintiffs' counsel and Federal Express went to extraordinary lengths to deliver Plaintiffs' trial materials to Zakharenko, and Zakharenko was aware of at least

some of those efforts; indeed, after three failed attempts at delivery, she advised Federal Express

that she would pick up the materials from a Federal Express location, but she failed to do so.

(*Id.*; Docket No. 89).  Neither the Court nor Plaintiffs received any communications from

Zakharenko from May 4, 2015, through July 16, 2015.  (*See* Docket No. 79).  Accordingly, on

July 17, 2015, the Court issued an Order setting a schedule for Plaintiffs to seek a default

judgment against Zakharenko.  (Docket No. 80).  Plaintiffs filed a motion for default judgment

on July 30, 2015 (Docket No. 81), which the Estate subsequently joined (Docket No. 84), and the

Court ordered Zakharenko to file any opposition by August 14, 2015.  (Docket No. 85).

After months of silence, Zakharenko finally reemerged on August 13, 2015, filing a one-

page letter indicating that she opposed the motion for default judgment.  (Docket No. 86).  At a

conference held on August 26, 2015, Zakharenko (who had arrived ten minutes late) claimed that

she had never received Plaintiffs' pretrial papers.  (August 26, 2015 Conference Tr. (Docket No.

95) ("Conf. Tr.") 6-7).  Zakharenko acknowledged that the home address Plaintiffs sent their

pretrial papers to was correct, and claimed that she had been "at home 24/7" due to illness.  (*Id.*

at 3).  But Zakharenko nevertheless claimed that she did not receive those papers from Federal

Express.  She acknowledged that she was aware that Federal Express was attempting to deliver

the materials to her, but claimed she never received the package due to a back injury and

confusion about where the package was being held.  (*Id.* at 6-7).  Zakharenko also denied

receiving any communications sent to her by e-mail because the e-mail address listed on the

docket was no longer functional.  (*Id.* at 4).  Similarly, Zakharenko claimed that the telephone

number listed on the docket was no longer functioning because her cell phone was stolen.  (*Id.* at

4).  In short, Zakharenko produced a battery of excuses, amounting to a claim that she was

absolutely unreachable during the period of time that Plaintiffs had tried to deliver their pretrial

papers to her.  But, as the Court pointed out at the conference, Zakharenko attended the May 4th

conference in person and therefore knew that trial materials would be delivered to her in early

June, triggering her deadline to respond.  (*Id.* at 7-8).  Even though Zakharenko was aware that

those materials were to be served on her in early June, she never accepted service of the

materials at her home, failed to update her e-mail or phone information with Plaintiffs or the

Court, and never contacted Plaintiffs or the Court to arrange for delivery of those materials.

The Court ultimately denied Plaintiffs' motion for default judgment in light of

Zakharenko's appearance at the August 26th conference and her expressed intent to litigate the

case.  (*Id.* at 12).  Plaintiffs' counsel then handed Plaintiffs' trial materials to Zakharenko in

court.  (*Id.* at 14).  In light of Zakharenko's failures to obey court orders, the Court sanctioned

Zakharenko and ordered her to pay Plaintiffs' counsel $1,000 for the extra time and effort spent

attempting to deliver trial materials to her.  (*Id.* 16-17).  Finally, to the extent relevant here, the

Court granted Zakharenko an extension of time *nunc pro tunc* to submit her trial materials.  (*Id.*

at 28; *see* Docket No. 74).  Specifically, at the conference and in a subsequent Order

memorializing the conference (Docket No. 90), the Court made clear to Zakharenko that she was

required to submit all pretrial papers by September 4, 2015, including any evidence she wished

to proffer at trial, affidavits of any witnesses she intended to call, and papers indicating whether

she intended to cross-examine Suzanne or Devon McCarthy.  The Court unambiguously warned

Zakharenko that she would not be able to submit evidence, call her own witnesses, or cross

examine Plaintiffs' witnesses if she failed to submit papers by that date.  (*See, e.g.*, Conf. Tr. at

31).  Zakharenko acknowledged that she understood that deadline and the consequences of

failing to meet it.  (*Id.* at 29).

Zakharenko never submitted any materials to the Court.  At the final pretrial conference on September 22, 2015, Zakharenko again provided numerous excuses for her repeated failure to submit her pretrial papers, which the Court did not find credible.  The Court nevertheless provided Zakharenko with the chance to submit proposed exhibits she brought with her to the conference.  Despite the Court's prior orders, however, Zakharenko failed to provide an affidavit authenticating those exhibits, and the Court declined to accept them for lack of authentication. The Court then declared the record to be closed.  The Court held a bench trial — such as it was, given Zakharenko's failure to submit any evidence or to identify any of Plaintiffs' witnesses for cross-examination — on September 30, 2015.  The Court gave Zakharenko an opportunity to object to Plaintiffs' evidence, which she declined to do.  (Trial Tr. at 3-4).  Zakharenko was also given fifteen minutes to make arguments based on the evidence before the Court, but the Court ultimately allowed Zakharenko to speak for nearly thirty minutes.  (*See* Trial Tr. at 17).  During her argument, Zakharenko made reference to numerous documents that were never submitted to the Court or to opposing counsel.  For the sake of having a complete record, the Court allowed Zakharenko to submit those documents to the Court, along with hard copies of various cases Zakharenko relied on in her argument.  (*See* Trial Tr. at 19; Docket No. 94).

Prior to trial, the Estate and Plaintiffs reached a conditional settlement of Plaintiffs' claims against the Estate.  In their joint Pretrial Statement, the parties informed the Court that the Estate "agreed to accept a judgment against it in favor of Plaintiffs for the sum of $3,949,785.17 less any sum awarded to Plaintiffs from the . . . claims against Defendant Zakharenko."  Joint Pretrial Statement (Docket No. 77) 10.

## CONCLUSIONS OF LAW

In light of the dismissal of all claims against Aetna, and the conditional settlement between Plaintiffs and the Estate, the only remaining disputes relate to Zakharenko.  First, Plaintiffs and the Estate argue that Decedent made constructively fraudulent transfers to Zakharenko and that Zakharenko is personally liable to the Estate for the value of the assets she received — $357,105.83.  Second, Plaintiffs and Zakharenko both claim entitlement to the proceeds of the Aetna policy.  Having reviewed the parties' arguments in light of the evidence, the Court agrees with the Estate and Plaintiffs and rules against Zakharenko on both issues.

**A.  Transfers to Zakharenko**

First, Plaintiffs and the Estate principally argue that the transfers the Decedent made to Zakharenko from 2011 to 2013 were constructively fraudulent because the Decedent was insolvent throughout that time period.  Under Section 273 of the New York Debtor and Creditor Law ("DCL"), which applies here, "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without fair consideration."  In other words, a conveyance made by a debtor will be deemed constructively fraudulent under Section 273 "if two separate elements are satisfied: first, 'it is made without fair consideration,' and second, 'the transferor is insolvent or will be rendered insolvent by the transfer in question.'"  *United States v. Watts*, 786 F.3d 152, 164 (2d Cir. 2015) (quoting *In re Sharp Int'l Corp.*, 403 F.3d 43, 53 (2d Cir. 2005)).  Here, Zakharenko does not contest that she did not provide "fair consideration" for the transfers she received from the Decedent.  (*See* SM Aff. ¶¶ 47, 54).  Thus, the only question is whether the Decedent was insolvent at the time he made the transfers to Zakharenko or if those transfers themselves rendered him insolvent.

The DCL provides that a person is insolvent "when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured."  DCL § 271(1).  Significantly, however, "[o]nly assets with a present salable value are taken into consideration in determining insolvency. Claims that are inchoate, uncertain, and contested have no present value and cannot be considered an asset of the [transferor]."  *First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.*, 871 F. Supp. 2d 103, 120 (E.D.N.Y. 2012) (internal quotation marks omitted); *see also, e.g.*, *Morgan Guar. Trust Co. v Hellenic Lines Ltd.*, 621 F. Supp. 198, 220 (S.D.N.Y. 1985) ("It is the fair saleable value of assets, not their book value, that determines insolvency."); *Ede v. Ede*, 598 N.Y.S. 2d 90, 92 (3d Dep't 1993) (holding that interest subject to a life estate is "an interest so inchoate, uncertain and contingent in nature as to clearly lack a present fair salable value").  "To be 'salable' an asset must have 'an existing and not theoretical market.'" *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1067 (3d Cir. 1992) (discussing the Uniform Fraudulent Conveyance Act analogue to DCL Section 273)).  Where, as here, "a transfer has been made for no consideration, New York law recognizes a rebuttable presumption of insolvency and fraudulent transfer, and the burden then shifts to the transferee to overcome that presumption."  *Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 445 (S.D.N.Y. 2014) (gathering cases).  The transferee "need only come forward with some evidence . . . to rebut the presumption, as the burden of persuasion . . . remain[s] with the party challenging the conveyance."  *In re Nirvana Rest. Inc.*, 337 B.R. 495, 505 (Bankr. S.D.N.Y. 2006).

Applying those standards here, there is no question that the Decedent was insolvent at all relevant times, and Zakharenko has certainly not rebutted the presumption of insolvency as she presented no evidence whatsoever at the trial.  In fact, the only substantial arguable assets the

Decedent had were his $4.5 million claims against Lehman Brothers Holdings, Inc.  (*See* Pls.'
Trial Exs. R, T).[2]  Those claims, however, have (and, at all relevant times, had) no "present
salable value": There has never been an "existing market" for the sale of the Decedent's
bankruptcy claims against his former employer and, in any event, those claims were "too
contingent and uncertain to have been salable."  *ACLI Gov't Secs., Inc. v. Rhoades*, 653 F. Supp.
1388, 1394 (S.D.N.Y. 1987).[3]  At the same time, the Decedent did have substantial debts.  Under
New York law, debt is broadly defined to include "any legal liability, whether matured or
unmatured, liquidated or unliquidated, absolute, fixed or contingent."  DCL § 270.  In this case,
at all relevant times, the Decedent owed $93,196 in taxes, plus interest, to New York State.  (*See*
Pls.' Trial Ex. S).  His obligations under the MSA also qualified as "existing debts."  In
particular, beginning 2012, the Decedent became unable to pay Devon's college tuition, as
required under the MSA (MSA 6), and had to borrow $60,000 to cover part of those expenses.
(DM Aff. ¶ 36).  Devon also had to borrow or pay additional money — approximately $50,000
— to pay the remainder of her tuition.  (*Id.*).  The Decedent was also unable to make the
premium payments required to prevent his life insurance policies from lapsing by 2013 (*see* Pls.'
Trial Exs. C, D, E), and was unable to pay an American Express invoice for $93,228.67

---

[2]     The record also includes bank records from the Decedent's Chase Bank checking
accounts.  (Pls.' Trial Ex. I).  The average ending balance carried in those accounts from
December 2011 to July 2013, however, was only about $25,000.  (*See id.*).  That is, the balance
in those accounts was significantly less than the Decedent's debts at all relevant times and does
not have a material effect on the Court's insolvency analysis.

[3]     Underscoring the contingent (and non-marketable) nature of the Decedent's bankruptcy
claims, the Bankruptcy Court confirmed a Chapter 11 plan in 2011, *see In re Lehman Brothers
Holdings Inc.*, 08-13555 (JMP), No. 23023 (Bankr. S.D.N.Y. Dec. 6, 2011), which reclassified
his claims as highly subordinate equity interests.  (DM Aff. ¶ 41).  The Decedent's claims
therefore stand behind all other classes of interests in obtaining distribution from the bankruptcy
estate (*id.* ¶ 42), making the prospect of any recovery remote or nonexistent.

beginning in April 2013.  (Pls.' Trial Ex. H).  Those unpaid debts and obligations indicate that, during all relevant times, Decedent was not only unable theoretically to "pay his probable liability on his existing debts as they bec[ame] absolute and matured," DCL § 271(1), but was *in fact* unable to pay actual liabilities on his existing debts as they came due.  Finally, although the "operative reference point for determining insolvency is the time at which the transfer took place" and "insolvency of the transferor . . . cannot be presumed from subsequent insolvency at a later point in time," *In re Chin*, 492 B.R. 117, 127 (Bankr. S.D.N.Y. 2013) (internal quotation marks omitted), the Decedent's insolvency is confirmed by the fact that he was unable to make the payments necessary to maintain his life insurance policies prior to his death (*see* Pls.' Trial Exs. C, D, E) and that the Estate is currently insolvent and unable to pay off his creditors (*see* Pls.' Trial Ex. R).

Accordingly, as a matter of New York law, the Court holds that Decedent was either insolvent or rendered insolvent at the time he made the relevant transfers to Zakharenko and that Zakharenko did not provide fair consideration for those transfers.  The Court therefore holds that, under DCL § 273, all transfers Decedent made to Zakharenko from 2011 to 2013 were constructively fraudulent.  The Estate and Plaintiffs argue that Zakharenko should be held individually liable as the beneficiary of those fraudulent transfers.  The Court agrees.  Under New York law, a creditor may recover money damages against a transferee who received assets via a fraudulent transfer.  *See Cadle Co. v. Newhouse*, 74 F. App'x 152, 153 (2d Cir. 2003) (summary order) ("[A] creditor may recover money damages against parties who participate in the fraudulent transfer and are either transferees of the assets or beneficiaries of the conveyance." (quoting *RTC Mort. Trust 1995-S/N1 v. Sopher*, 171 F. Supp. 2d 192, 201 (S.D.N.Y. 2001))).  Further, "where the assets fraudulently transferred no longer exist," the Court may enter a money

judgment "in an amount up to the value of the fraudulently transferred assets." *Neshewat v. Salem*, 365 F. Supp. 2d 508, 521-22 (S.D.N.Y. 2005). In this case, Zakharenko benefitted from the fraudulent transfers made to her by the Decedent and is therefore personally liable in money damages to the Estate up to the value of the assets she received — $357,105.83 — less the value of any transferred assets Zakharenko is able to return to the Estate.[4]

## B. The Aetna Policy Proceeds

For similar reasons, the Court concludes that Plaintiffs are entitled to the proceeds of the Aetna insurance policy. Significantly, the Court need not resolve whether Zakharenko was designated as the primary beneficiary on the Aetna Policy, as the Universal Enrollment Form filed with Aetna suggests. Even assuming that Zakharenko was so designated, equity commands that the Court impose a constructive trust on the paid-out proceeds of that policy. The Decedent, upon his failure to maintain death benefits in the amount of $4 million in accordance with the terms of the MSA, had "an obligation to name [Plaintiffs] as benficiar[ies] on . . . later policies." *Simonds v. Simonds*, 45 N.Y.2d 233, 240 (1978). Under New York law, that obligation is "enforceable in equity despite [the Decedent's] failure to comply with the terms of the separation agreement" and, when the Decedent died, Plaintiffs acquired "not only a right at law to sue his estate for breach of contract, a right now worthless, but also an equitable right" in the proceeds of the Aetna policy. *Id.*; *see also Rogers v. Rogers*, 63 N.Y.2d 582, 586-87 (1984) (similar). As Plaintiffs provided consideration in exchange for that equitable right, their rights are superior to the rights of Zakharenko, a gratuitous beneficiary. *See Simonds*, 45 N.Y.2d at 239 (holding that an interest obtained through an agreement supported by consideration "is superior to that of a

---

[4]     Plaintiffs conceded during the bench trial that they have no special claim to the fraudulently transferred funds and that whatever funds can be recovered from Zakharenko should go to the Estate rather than directly to Plaintiffs. (Trial Tr. 24-25).

named beneficiary who has given no consideration").  Plaintiffs "remedy is imposition of a constructive trust" on the proceeds of the Aetna policy.  *Id.* at 241.[5]

ERISA does not preempt the imposition of a constructive trust on the proceeds of the policy.  In *Kennedy v. Plan Administrator for DuPont Savings and Investment Plan*, 555 U.S. 285 (2009), the Supreme Court identified three objectives that ERISA is intended to further: (1) simple administration, (2) avoiding double liability for plan administrators, and (3) ensuring that beneficiaries "get what's coming quickly, without the folderol essential under less-certain rules." *Id.* at 301 (internal quotation marks and citations omitted).  As many courts have held in the wake of that decision, after proceeds have been distributed, parties' rights and equities may be determined without regard to ERISA because post-distribution suits do not interfere with any of those objectives.  *See, e.g.*, *Andochick v. Byrd*, 709 F.3d 296, 299-301 (4th Cir. 2013).  Here, as noted above, upon the consent of all parties (including Zakharenko, who was represented by counsel at the time), the proceeds of the contested policy were paid out by Aetna and are now being held by the Court pending resolution of this case.  (*See* Docket No. 24).  Thereafter, all claims against Aetna were dismissed.  (Docket No. 35).  In other words, Aetna was able to quickly administer the plan benefits to the named beneficiary by depositing the proceeds of the

---

[5]        In arguing otherwise (*see* Docket No. 94), Zakharenko cites cases holding that, where a life insurance policy is merely intended to secure child support or alimony obligations, the surviving spouse is only entitled to the proceeds of the life insurance policy to the extent the decedent has failed to make payments to the spouse or dependent children.  *See generally* Jani Maurer, *Use and Disposition of Life Insurance in Dissolution of Marriage*, 16 Barry L. Rev. 57 (2011) (discussing cases).  Those cases, Zakharenko suggests, mean that Plaintiffs should be able to recover from the proceeds of the life insurance policy only to the extent that the Decedent failed to make alimony or child support payments guaranteed by the MSA.  But Zakharenko's reliance on those cases is misplaced, as the life insurance provision of the MSA was not intended to secure alimony or child support payments.  (*See* SM Aff. ¶ 15; MSA 10).  Instead, the Decedent's commitment to maintain life insurance policies providing $4 million in benefits was consideration for Suzanne's accommodation regarding alimony payments and for her waiver of any claim to additional assets from the Decedent.  (SM Aff. ¶ 15; MSA 10).

plan with the Court. Aetna has had no role in post-distribution proceedings. Nor is Aetna

exposed to any risk of double liability: All claims against Aetna related to the contested policy

were dismissed after it deposited the proceeds with the Court. As for the final objective,

ensuring that beneficiaries "get what's coming quickly," *Kennedy*, 555 U.S. at 301, that "refers

to the expeditious distribution of funds *from plan administrators,* not to some sort of rule

providing continued shelter from contractual liability to beneficiaries who have *already received*

plan proceeds." *Andochick*, 709 F.3d at 299-300 (quoting *Estate of Kensinger v. URL Pharma,*

*Inc.*, 674 F.3d 131, 136 (3d Cir. 2012)).[6]

## CONCLUSION

For the foregoing reasons, the Court concludes that the Decedent was insolvent at all

relevant times and that all transfers made by the Decedent to Zakharenko were constructively

fraudulent. Accordingly, applying New York law, the Court holds that Zakharenko is personally

liable to the Estate for the value of the fraudulent transfers she received from the Decedent, or

$357,105.83, less the value of any transferred assets Zakharenko is able to return to the Estate.

The Court also holds that a constructive trust should be imposed on the proceeds of the

Aetna policy in favor of Plaintiffs. That sort of post-distribution constructive trust does not

conflict with ERISA's objectives, and is therefore not preempted. It is therefore ordered that the

Clerk of Court shall release the proceeds of the Aetna policy — $495,000 currently held in the

---

[6]       This case is also distinguishable from cases involving qualified joint and survivor
annuities. In that context, the Supreme Court has observed that ERISA displays special
"solicitude for the economic security of surviving spouses" and "provide[s] detailed protections
to spouses of plan participants which, in some cases, exceed what their rights would be were
[state] community property law the sole measure." *Boggs v. Boggs*, 520 U.S. 833, 841, 843
(1997). But that "clear congressional objective" of "ensuring ongoing financial support for
divorced and surviving spouses," *VanderKam v. VanderKam*, 776 F.3d 883, 890 (D.C. Cir.
2015), is not implicated in this post-distribution suit regarding proceeds of a life insurance
policy.

Court's registry — to Plaintiffs.  Distribution of that $495,000 sum should presumably be made *pro rata* according to the terms of the MSA, with 50% going to Suzanne and 25% each to Devon and Emma.  Plaintiffs are directed to file a proposed judgment with the Court proposing an appropriate distribution of the Aetna proceeds between Plaintiffs.

It is further ordered that, consistent with the conditional settlement reached by Plaintiffs and the Estate, the Estate is liable to Plaintiffs for $3,949,785.17 in compensatory damages plus interest, less the proceeds of the Aetna policy.

Finally, Zakharenko filed crossclaims and counterclaims against Plaintiffs seeking an award of attorney's fees and expenses.  (*See* Docket No. 56).  In addition to submitting no evidence or argument in support of those claims, Zakharenko did not press those claims before the Court during the bench trial.  (*See* Trial Tr. 7-18).  The Court therefore dismisses those claims with prejudice for lack of proof.

No later than November 13, 2015, Plaintiffs shall serve a copy of this Opinion and Order on Zakharenko by e-mail and shall promptly file proof of such service.  In addition, and out of an abundance of caution, the Clerk of Court is directed to mail a copy of the Opinion and Order to Zakharenko at the address appearing on the docket.

SO ORDERED.

Date:   November 10, 2015
New York, New York

JESSE M. FURMAN
United States District Judge

18